******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MADELEINE GLEASON ET AL. *v.* JANICE
SMOLINSKI ET AL.
(SC 19342)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued April 27—officially released November 3, 2015*

*Steven J. Kelly*, pro hac vice, with whom were *Christopher P. DeMarco* and, on the brief, *Anne T. McKenna*, pro hac vice, for the appellants (named defendant et al.).

*John R. Williams*, for the appellee (named plaintiff).

*Opinion*

ROBINSON, J. On August 24, 2004, thirty-one year old William Smolinski, Jr. (Bill),[1] disappeared from his home in the city of Waterbury, never to be seen or heard from again. Firmly convinced that the plaintiff Madeleine Gleason,[2] who was Bill's former girlfriend and a fellow school bus driver, either caused or knew more about Bill's disappearance than she would say, and having noticed that the plaintiff and a friend, Fran Vrabel, were removing certain missing person flyers, the defendants, Janice Smolinski and Paula Bell,[3] Bill's mother and sister respectively, began to pressure the plaintiff into cooperating with the ongoing investigation. The defendants' tactics included, among other things, saying disparaging things to the plaintiff's friends and acquaintances on several occasions and posting copious numbers of missing person flyers depicting Bill along the plaintiff's school bus route and near her home. These tactics led the plaintiff to bring the civil action that gave rise to this appeal against the defendants, claiming, inter alia, defamation and intentional infliction of emotional distress.

The defendants now appeal, upon our grant of their petition for certification,[4] from the judgment of the Appellate Court affirming the trial court's judgment awarding the plaintiff compensatory and punitive damages on her claims of intentional infliction of emotional distress and defamation. *Gleason* v. *Smolinski*, 149 Conn. App. 283, 285–86, 88 A.3d 589 (2014). The defendants' first claim on appeal, which relies on, inter alia, *Snyder* v. *Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011), is that the plaintiff's claim of intentional infliction of emotional distress is barred because it arises from speech protected by the first amendment to the United States constitution,[5] namely, the act of posting missing person flyers on public roadways. The defendants then claim that the Appellate Court improperly upheld the trial court's determination that they had committed the tort of defamation because, inter alia: (1) the Appellate Court applied an improperly deferential standard of review; (2) their allegedly defamatory statements were protected opinion; and (3) the plaintiff failed to carry the requisite burden of proof. We conclude that a new trial is required because the trial court's findings on the plaintiff's claims of defamation and intentional infliction of emotional distress did not consider, and are not consistent with, the various limitations placed on these torts by the first amendment. Accordingly, we reverse the judgment of the Appellate Court.

The record, including the Appellate Court's opinion and the findings set forth in the trial court's memorandum of decision, reveals the following relevant facts and procedural history. The plaintiff was, at all times relevant to the present case, employed by B and B

Transportation, Inc., as a school bus driver. For a period of time, Bill worked at the same company. The two met there and began dating. Soon thereafter, Bill ended his relationship with the plaintiff and his employment at B and B Transportation, Inc. About one year later, Bill and the plaintiff began dating again. During a vacation together in Florida, however, they broke up because of problems in their relationship, including the fact that the plaintiff was much older than Bill, and his belief that she was cheating on him with Chris Sorensen, a local married politician.[6]

Two days after returning from his trip to Florida with the plaintiff, Bill disappeared without a trace. "The trial testimony revealed that because of the plaintiff's alleged affair with Sorensen . . . the defendants formed the belief [t]hat [the plaintiff] was in a love triangle with [Bill] and . . . another fellow . . . and that [Bill] had gone missing, and that they . . . thought that [the plaintiff] had done something to him . . . ." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, supra, 149 Conn. App. 287 n.3. The day before Bill disappeared, Sorensen received a threatening message on his answering machine; both the plaintiff and Bell identified the voice as belonging to Bill.[7]

Shortly after his disappearance, the defendants and William Smolinski, Sr., Bill's father, "started putting up missing [person] posters[8] in various parts of the state. They then noticed some of the posters were being torn down or vandalized and discovered the plaintiff and [Vrabel] were engaged in this activity. The . . . defendants . . . then proceeded to follow [the plaintiff] and videotaped her activities in this regard. [The plaintiff] claims the posters were placed along her school bus route and generally where she lived, worked, and conducted some of her life activities. Eventually some of these activities led to the plaintiff going to the . . . police station [in the town of Woodbridge], where the defendants soon followed. A confrontation took place between the parties." (Footnote altered; internal quotation marks omitted.) Id., 288.

The plaintiff then brought the present action against the defendants. As the Appellate Court noted, the plaintiff "claims the defendants' activities interfered with and damaged her monetarily by interfering with her business of operating a school bus for a living. She also says she was defamed by the defendants who had characterized her as a murderer. She also states that her right to privacy was invaded and that generally the defendants intentionally inflicted great emotional stress on her, causing her much anxiety and torment.

"The defendants countered the allegations by saying [that the] alleged actions critical of them were, generally speaking, all lies. They deny entering a bus which [the plaintiff] was driving or going on school property to post a missing [person] poster at a school where [the

plaintiff] brought and dropped off students. They deny calling [the plaintiff] a murderer or harassing her on the phone. The plaintiff and the defendants trade mutual accusations about being followed by [each other]." (Internal quotation marks omitted.) Id., 288–89.

Following a court trial, the trial court, *Hon. Thomas J, Corradino*, judge trial referee, "found that the defendants' conduct constituted intentional infliction of emotional distress and that their statements that the plaintiff was a murderer or was involved in murder constituted defamation. The court awarded the plaintiff compensatory damages of $32,000 on her claim of intentional infliction of emotional distress and $7500 on her claim of defamation, for a total compensatory damages award of $39,500. The court also awarded the plaintiff [$13,166.67 in] punitive damages . . . an amount equal to one third of the plaintiff's total compensatory damages award . . . ." Id., 289.

The defendants appealed from the judgment of the trial court to the Appellate Court and claimed, inter alia,[9] that: (1) the plaintiff's intentional infliction of emotional distress claim was barred by the free speech clause of the first amendment, as explicated by the Supreme Court's decision in *Snyder* v. *Phelps*, supra, 562 U.S. 443, as their conduct was constitutionally protected "speech related to a matter of public concern because the missing person posters were designed to uncover information about [Bill's] disappearance, and to assist with the ongoing investigation and potential prosecution of a crime"; and (2) the plaintiff had failed to introduce sufficient evidence to support her defamation claims. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 286.

With respect to the defendants' first amendment claim, the Appellate Court first determined that it was unpreserved, and considered it under *State* v. *Golding*, 213 Conn. 213, 239–40, 567 A.2d 823 (1989).[10] *Gleason* v. *Smolinski*, supra, 149 Conn. App. 289–90. The Appellate Court concluded that the defendants could not establish the constitutional violation required by the third prong of *Golding* because, in contrast to the matters of public import that were discussed—albeit crudely and offensively—on the Westboro Baptist Church (Westboro) members' protest signs in *Snyder*, it agreed with the trial court's finding that, "[w]hile the content of the posters makes no specific reference to the plaintiff . . . the context and placement of the posters was designed to 'hound' the plaintiff into providing the defendants with information about [Bill's] disappearance . . . rather than to raise a matter of public concern" by seeking further information from the public about his disappearance. Id., 295.

With respect to the plaintiff's defamation claims, the Appellate Court reviewed the record and concluded that the trial court properly had found that the defen-

dants had made three defamatory statements regarding the plaintiff, namely, by telling various people that the plaintiff was a "murderer" or otherwise involved in Bill's disappearance. Id., 310. In particular, the Appellate Court relied on this court's decision in *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952), and concluded that the defendants' statements were defamatory per se, thus allowing a presumption that they had harmed the plaintiff's reputation, and relieving her of the burden of proving such harm. *Gleason* v. *Smolinski*, supra, 149 Conn. App. 310–12. Accordingly, the Appellate Court rendered judgment affirming the judgment of the trial court. Id., 314. This certified appeal followed. See footnote 4 of this opinion.

On appeal, the defendants claim that: (1) the first amendment bars the plaintiff's claims of intentional infliction of emotional distress; and (2) the Appellate Court improperly upheld the trial court's conclusion that they had committed the tort of defamation. Additional relevant facts and procedural history will be set forth where appropriate. We address each claim in turn.

I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

We begin with the defendants' contention that the Appellate Court improperly concluded that the first amendment did not bar the plaintiff's claim of intentional infliction of emotional distress, insofar as it arose from their constitutionally protected conduct in putting up missing person posters on public roadways, despite that conduct's design to target the plaintiff. The defendants argue that the Appellate Court, which treated the first amendment issue as an unpreserved constitutional claim reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40,[11] improperly deferred to the trial court's findings of fact, even though the trial court did not address the constitutional issue.[12] The defendants then contend that the Appellate Court's conclusion that the first amendment did not bar the plaintiff's claim of intentional infliction of emotional distress is "directly at odds" with the United States Supreme Court's decision in *Snyder* v. *Phelps*, supra, 562 U.S. 443. They posit that their poster campaign was constitutionally protected speech that pertained to a matter of legitimate public concern, namely, solving a serious crime and finding a missing person, and that the aspect of their conduct that "target[ed]" the plaintiff did not detract from the campaign's protected status because all of the flyers were posted in public places in a peaceful manner, and none mentioned the plaintiff by name, despite the trial court's finding that they were intended to "hound" her into giving them information about Bill's disappearance.

In response, the plaintiff argues that *Snyder* is factu-

ally distinguishable because the conduct at issue therein was not as invasive as the defendants' conduct in the present case, which they had specifically intended to be intimidating.[13] The plaintiff also claims that accepting the defendants' "broad notion that crime always is a legitimate matter of public concern" would encourage false accusations and "lynch mob style activity," and mean that "false accusations of criminal wrongdoing never would be actionable as . . . intentional infliction of emotional distress or defamation, but instead would be protected by the first amendment." We agree, however, with the defendants, and conclude that, given our review under *State* v. *Golding*, supra, 213 Conn. 239–40, a new trial is required on this count, taking into consideration the governing legal standards under the first amendment, because the trial court's findings with respect to intentional infliction of emotional distress are largely supported by conduct that is constitutionally protected and, therefore, not actionable.

"[T]he [f]irst [a]mendment bars . . . damages under the generally applicable laws of intentional and negligent infliction of emotional distress where those claims are based on constitutionally protected conduct."[14] *Cowras* v. *Hard Copy*, 56 F. Supp. 2d 207, 209–10 (D. Conn. 1999); see, e.g., *Snyder* v. *Phelps*, supra, 562 U.S. 451 ("[t]he [f]ree [s]peech [c]lause of the [f]irst [a]mendment . . . can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress"). "In certain first amendment contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 661–62, 822 A.2d 205 (2003); see also *Brown* v. *K.N.D. Corp.*, 205 Conn. 8, 13–14,

529 A.2d 1292 (1987) ("The function of the procedural scheme created by [the United States Supreme Court] . . . is obviously to require an independent second opinion when free speech is curtailed. These cases place the ultimate constitutional responsibility on appellate courts to render that second opinion in order to safeguard free expression." [Citations omitted.]), overruled in part on other grounds by *DiMartino* v. *Richens*, 263 Conn. 639, 663–64, 822 A.2d 205 (2003).

Nevertheless, "the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue [were not protected by the first amendment], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." *State* v. *Krijger*, 313 Conn. 434, 447, 97 A.3d 946 (2014); see also *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995) ("[t]he requirement of independent appellate review . . . does not limit our deference to a trial court on matters of witness credibility" [citation omitted; internal quotation marks omitted]). Thus, because the certified issues in this case do not embrace a challenge to the trial court's underlying factual findings, which already have been upheld on review by the Appellate Court; see footnotes 4 and 9 of this opinion; our de novo review is limited to determining whether the defendants' conduct, as found by the trial court, was subject to first amendment protection.[15] See *State* v. *Krijger*, supra, 448–49 (noting that Appellate Court properly relied on version of facts consistent with jury's verdict finding defendant guilty of threatening in second degree and breach of peace in second degree before engaging in independent review of record to determine whether remarks were not unprotected "true threats").

We begin with a review of *Snyder*, which is the leading United States Supreme Court decision on first amendment protection from tort claims of intentional infliction of emotional distress. *Snyder* arose from the protest activities of Westboro, whose small, but vociferous, congregation "believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military," and "frequently communicates its views by picketing, often at military funerals." *Snyder* v. *Phelps*, supra, 562 U.S. 448. Parishioners from Westboro held protests, replete with a barrage of offensively phrased signs, on "public land adjacent to public streets near the Maryland State House, the United States Naval Academy," and the funeral services for Marine Lance Corporal Matthew Snyder on the day of the service. Id. The protests were lawfully permitted and staged, and took place "approximately [1000] feet from the church where the funeral was held. Several buildings separated the picket site

from the church. . . . The Westboro picketers displayed their signs for about [thirty] minutes before the funeral began and sang hymns and recited Bible verses. None of the picketers entered church property or went to the cemetery. They did not yell or use profanity, and there was no violence associated with the picketing. . . .

"The funeral procession passed within 200 to 300 feet of the picket site. Although [Snyder's father] testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event." (Citations omitted.) Id., 449. A federal court jury subsequently awarded the Snyder's father several million dollars in damages for his claims, which included intentional infliction of emotional distress, against Westboro and several of its members. Id., 450.

Relying on *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 50–51, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988),[16] the Supreme Court posited that "[w]hether the [f]irst [a]mendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. [S]peech on matters of public concern . . . is at the heart of the [f]irst [a]mendment's protection. . . . The [f]irst [a]mendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. . . . That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. . . . Accordingly, speech on public issues occupies the highest rung of the hierarchy of [f]irst [a]mendment values, and is entitled to special protection. . . .

"[N]ot all speech is of equal [f]irst [a]mendment importance, however, and where matters of purely private significance are at issue, [f]irst [a]mendment protections are often less rigorous. . . . That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: [T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import." (Citations omitted; internal quotation marks omitted.) *Snyder* v. *Phelps*, supra, 562 U.S. 451–52.

The court then observed that, although "the boundaries of the public concern test are not well defined," it has "articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors." (Internal quotation marks omitted.) Id., 452. It explained that "[s]peech deals with matters of public concern

when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . . . The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." (Citations omitted; internal quotation marks omitted.) Id., 453.

Further, "[d]eciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record. . . . As in other [f]irst [a]mendment cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." (Citations omitted; internal quotation marks omitted.) Id., 453–54.

Turning to the record before it, the Supreme Court observed that the "content of Westboro's signs plainly relates to broad issues of interest to society at large, rather than matters of purely private concern," despite the fact that their "messages may fall short of refined social or political commentary, the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters of public import." (Internal quotation marks omitted.) Id., 454. The court observed that "even if a few of the signs—such as 'You're Going to Hell' and 'God Hates You'—were viewed as containing messages related to . . . Snyder or [his family] specifically, that would not change the fact that the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues." Id. The Supreme Court noted that the funeral context of Westboro's speech did not "transform [its] nature"; id., 454; emphasizing that Westboro "conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street.[17] Such space occupies a special position in terms of [f]irst [a]mendment protection. . . . [W]e have repeatedly referred to public streets as the archetype of a traditional public forum, noting that [t]ime out of mind public streets and sidewalks have been used for public assembly and debate." (Citations omitted; footnote added; internal quotation marks omitted.) Id., 454–56.

The court further rejected the argument that Westboro's conduct was a "personal attack on Snyder and his family," which it had attempted to "immunize . . . by claiming that they were actually protesting the

United States' tolerance of homosexuality or the supposed evils of the Catholic [c]hurch." (Internal quotation marks omitted.) Id., 455. The court was "not concerned in this case that Westboro's speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of . . . Snyder, and there can be no serious claim that Westboro's picketing did not represent its honestly believed views on public issues. . . . There was no [preexisting] relationship or conflict between Westboro and Snyder that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter." (Citation omitted; internal quotation marks omitted.) Id. Thus, the court held that, because "Westboro's speech was at a public place on a matter of public concern, that speech is entitled to special protection under the [f]irst [a]mendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt." (Internal quotation marks omitted.) Id., 458. Accordingly, the Supreme Court directed the lower federal courts to set aside the "jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress . . . ." Id., 459.

Post-*Snyder* cases make clear the critical import of the threshold inquiry into the nature of the communications at issue in determining whether allegedly tortious speech is subject to first amendment protection.[18] Thus, we begin with an examination of the objective nature of the speech at issue in the count of the complaint alleging intentional infliction of emotional distress, namely, the defendants' extensive campaign of missing person posters. It is well established that "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public . . . ." *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469, 492, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975). Indeed, "[p]ublic allegations that someone is involved in crime generally are speech on a matter of public concern." *Obsidian Finance Group, LLC* v. *Cox*, 740 F.3d 1284, 1292 (9th Cir.), cert. denied, U.S. , 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014); see also id., 1291–92 (allegation that bankruptcy trustee was participant in defrauding investors was matter of public concern).[19] This includes matters pertaining to missing persons. See *Holloway* v. *American Media, Inc.*, 947 F. Supp. 2d 1252, 1261 n.10 (N.D. Ala. 2013) ("[t]here is little question that the disappearance of Natalee Holloway, which dominated news coverage for many weeks, if not years, and which involved the safety of travel abroad and called up the worst fears of parents, was a matter of 'concern to the community' "); but cf. *Sartain* v. *White*, 588 So. 2d 204, 213 (Miss. 1991) (accusations in letters, pleadings, and oral tirades that plaintiffs were

"murderers, robbers and terrorists . . . generally are a matter of public concern," but not in specific context of neighbor dispute). In the present case, the missing person flyers posted by the defendants solely sought information about Bill, without referring to the plaintiff or anyone else potentially implicated in his disappearance, either directly or indirectly. Thus, the content of the communications at issue relates to a matter of public concern.

Our inquiry does not, however, end here, as we also must consider the form and context of the communications at issue. *Snyder* v. *Phelps*, supra, 562 U.S. 454. We agree with the Alaska Supreme Court's recent rejection of the "sweeping" argument that all "speech involving a matter of public concern is inactionable" under *Snyder*, and emphasize that the first amendment is "not an all-purpose tort shield." (Internal quotation marks omitted.) *Greene* v. *Tinker*, 332 P.3d 21, 34–35 (Alaska 2014); see also id., 35 (no first amendment absolute privilege to accuse hospital employee of breaching medical privacy). Indeed, as the Supreme Court has observed in acknowledging the possibility of "contriv[ance]"; *Snyder* v. *Phelps*, supra, 455; the first amendment cannot be used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern. See *Holloway* v. *American Media, Inc.*, supra, 947 F. Supp. 2d 1261–65 (first amendment did not, as matter of law, shield tabloid newspaper from intentional infliction of emotional distress claim in light of allegations that it knowingly and maliciously published false information about death and burial of plaintiff's missing daughter, given preexisting animus between parties); cf. *United States* v. *Sergentakis*, United States District Court, Docket No. 15CR33 (NSR) (S.D.N.Y. June 15, 2015) (defendant's accusations that victim had engaged in child molestation and animal cruelty could be protected under first amendment in other contexts, but not in cyberstalking and witness retaliation case wherein they were "thinly veiled" revenge for victim's cooperation with investigation that led to defendant's guilty plea on other charges); *People* v. *Little*, Docket No. 4-13-1114, 2014 WL 7277785, *7 (Ill. App. December 22, 2014) (The court rejected the defendant's argument that the state stalking statute was unconstitutionally overbroad under *Snyder* because the "preexisting relationship and conflict [between the defendant and his wife] strongly suggest [the] defendant is attempting to mask an attack on [his wife] over a private matter as a protest of a matter of public concern," namely, his claim that he was protesting her decision to get an abortion, and "[n]othing in the evidence suggests that in driving by [the women's shelter], [the] defendant intended to peacefully protest a matter of public concern in a public forum. This is particularly true when, in his own testimony and in statements to police, he denied intentionally driving

by [the women's shelter]," and "nothing in the record demonstrates [the] defendant intended to 'convey his position on abortion utilizing a method designed to reach as broad a public audience as possible.' "), appeal denied, 31 N.E.3d 771 (Ill. 2015).

Nevertheless, although the existence of preexisting animus between parties might indicate circumstantially that a defendant is dressing intentionally tortious conduct in the garb of the first amendment, such animus, including the defendant's motive to harm the plaintiff, "does not necessarily render the messages conveyed . . . matters of purely private rather than public concern." *Spacecon Specialty Contractors*, *LLC* v. *Bensinger*, 713 F.3d 1028, 1038 (10th Cir. 2013). The vehicle, context, and content of the messages remains of paramount importance. See id., 1038–39 (evidence that organizer's motive to harm corporation arising from its labor dispute with union led him to make documentary film did not mean that documentary was not matter of public concern, because it addressed its unfair labor practices with respect to use of foreign laborers, which is matter of public concern); accord *State* v. *Carpenter*, 171 P.3d 41, 58–59 (Alaska 2007) (radio show host engaged in protected conduct when he ridiculed and humiliated local critic of his show, but crossed line to unprotected intentional infliction of emotional distress when he issued " 'call to arms' " to his supporters, broadcast critic's home telephone and fax numbers, and encouraged supporters to use those numbers to harass her).

Turning to the record in the present case, we acknowledge the trial court's finding that "one of the important lines of evidence relied on by the plaintiff to establish this tort [of intentional infliction of emotional distress] was the hanging of posters in areas where the plaintiff lived and worked for the sole purpose of intimidating and harassing the plaintiff. The plaintiff claims posters, showing a picture of . . . Bill . . . with contact information, were hung throughout her bus route, at places where she lived and worked and even near, if not on school grounds, where she picked up and dropped off children. This went on for months."[20] The defendants' preexisting intention to "hound" the plaintiff until she "broke" with respect to what she knew about Bill's disappearance did not, however, necessarily transform the protected nature of their speech; see, e.g., *Spacecon Specialty Contractors*, *LLC* v. *Bensinger*, supra, 713 F.3d 1038; particularly given that the targeted content and location was consistent with the overarching public concern of gaining information about Bill's disappearance, in particular by persuading the plaintiff to be forthcoming with her knowledge about the case.[21] See *State* v. *Carpenter*, supra, 171 P.3d 58 (noting that radio host's constitutionally unprotected words encouraging his listeners to harass critic "were devoid of any express or implicit message that a jury might deem an attempt to persuade [her], except perhaps out of fear of

harassment, to withdraw her objections to broadcasting the show"); see also id., 59 ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an [intentional infliction of emotional distress] claim if, in addition to meeting the other requirements for an [intentional infliction of emotional distress] claim, it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate").

Moreover, the missing person posters created by the defendants in the present case were entirely content-neutral with respect to the plaintiff; none mentioned her by name, and all simply contained photographs and descriptions of Bill, along with reward and tip information. In contrast to the posters in the present case, the signs in *Snyder* referred, at least obliquely, to Snyder, insofar as they stated "You're Going to Hell" and "God Hates You." See *Snyder* v. *Phelps*, supra, 562 U.S. 448. Second, it is undisputed that all of the posters were placed on or adjacent to public roadways, which are traditional public fora subject to heightened first amendment protection—notwithstanding the trial court's finding that many of the particular locations chosen by the defendants were not likely to be particularly fruitful sources of leads as to Bill's whereabouts. See, e.g., id., 455–56; see also *Frisby* v. *Schultz*, 487 U.S. 474, 480–81, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) (emphasizing that "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood" and that "[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora"); *Lewis* v. *McCracken*, 782 F. Supp. 2d 702, 711–12 (S.D. Ind. 2011) (following multiple circuits and holding that "privately owned sidewalks bordering public roads qualify as traditional public forums"); *Rodriguez* v. *Fox News Network, LLC*, 356 P.3d 322, 324–28 (Ariz. App. 2015) (first amendment barred intentional and negligent infliction of emotional distress claims arising from news broadcast of driver's suicide at conclusion of high speed chase because law enforcement response to crime is matter of public concern and events happened on public highway).

To this end, we find instructive the New Hampshire Supreme Court's recent decision in *Keene* v. *Cleaveland*, N.H. , 118 A.3d 253 (2015). In *Keene*, a city brought tort claims for damages, alleging tortious interference with contract, civil conspiracy, and negligence, against persons who had engaged in an aggressive protest of the city's parking enforcement policies by following and videotaping parking enforcement officers in the performance of their duties. Id., 255–56. Although acknowledging that the content of their speech was constitutionally protected, the city argued that the protesters' behavior, "following closely, chas-

ing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity—constitute improper interference with the [officers'] employment duties. The [c]ity contends that this conduct is significantly harassing behavior under the guise of political expression, and, therefore, not constitutionally protected. The [c]ity asserts, therefore, that a jury may impose tort liability without unconstitutionally burdening the [protesters'] right to free speech."[22] (Internal quotation marks omitted.) Id., 258.

Following *Snyder*, the New Hampshire Supreme Court rejected the city's arguments, concluding that the first amendment barred the city's tort claims against the protesters. Id., 261. The court disagreed with the city's claim that the form and context of the protesters' seemingly harassing behavior rendered it constitutionally unprotected, noting first that the city did not "challenge the trial court's conclusions that the content of the [protesters'] speech is protected by the [f]irst [a]mendment because it relates to a matter of public concern, and that the [contested] activities take place in a traditional public forum—the streets and sidewalks of [the city]." Id., 260. The court agreed with the protesters' arguments that "[e]ven those activities that did not involve speech [are] expressive conduct entitled to [f]irst [a]mendment protection, and, therefore, are insulated from tort liability," and "absent acts of significant violence, the [f]irst [a]mendment protects their nonverbal acts from tort liability." (Internal quotation marks omitted.) Id. Following *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 916–17, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982), which rejected a tort claim for damages arising from a boycott of the plaintiff's businesses, the court held that the protesters' "challenged conduct, like [their] protected speech, is intended to draw attention to the [c]ity's parking enforcement operations and to persuade the [officers] to leave their positions. There is no allegation that the challenged conduct involves violent conduct. . . . Moreover, conduct does not lose its protected character . . . simply because it may embarrass others or coerce them into action. . . . We hold, therefore, that the [f]irst [a]mendment shields the [protesters] from tort liability for the challenged conduct."[23] (Citations omitted; internal quotation marks omitted.) *Keene* v. *Cleaveland*, supra, 118 A.3d 261.

Guided heavily by this recent New Hampshire decision,[24] which considered similarly targeted and harassing conduct, we conclude that a substantial portion of the defendants' conduct that the trial court found to constitute the intentional infliction of emotional distress was, in fact, protected by the first amendment. This is particularly so, given that the trial court's finding that the defendants' conduct was solely intended to harass and "break" the plaintiff did not consider whether those actions were intended to persuade her

with regard to a matter of public concern as in *Keene*, rather than merely torture her gratuitously with regard to a purely private matter. See *Snyder* v. *Phelps*, supra, 562 U.S. 458–59. The defendants have, therefore, established a constitutional violation under the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 10 of this opinion.

Turning to the fourth prong of *Golding*, namely, whether reversal is required, we conclude that the plaintiff, as appellee, has not established that the constitutional violation was harmless beyond a reasonable doubt, given the apparent significance of the flyer campaign to the trial court's finding on her intentional infliction of emotional distress claim. We cannot, however, direct judgment as a matter of law for the defendants because the record demonstrates that, in addition to the posters, which are constitutionally protected if not solely a contrived means for malicious harassment on a matter of private concern; see *Snyder* v. *Phelps*, supra, 562 U.S. 458–59; the defendants also engaged in other confrontational and harassing behavior, including calling the plaintiff offensive names, following her, and videotaping her activities.[25] Some or all of this conduct might well be held to furnish an independent basis for the judgment in favor of the plaintiff on her intentional infliction of emotional distress claims, but neither the Appellate Court nor the trial court made specific determinations to this effect, instead focusing their analyses primarily on what they deemed to be the defendants' ill-motivated flyer campaign. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 305–307. We leave to the trial court, as the finder of fact, to consider in the first instance whether the record supports a finding of intentional infliction of emotional distress independent of any constitutionally protected conduct. But see *Appleton* v. *Board of Education*, 254 Conn. 205, 211, 757 A.2d 1059 (2000) ("[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress" [internal quotation marks omitted]). Accordingly, we conclude that the defendants are entitled to a new trial, at which the trial court can consider the evidence in light of the governing first amendment principles.[26]

## II

### DEFAMATION CLAIMS

We next turn to the defendants' claim that the Appellate Court improperly upheld the trial court's conclusion that they had committed the tort of defamation. In support of this claim, the defendants contend, inter alia, that: (1) the Appellate Court improperly applied the clearly erroneous standard of review to all of the trial court's conclusions; and (2) the plaintiff improperly was not required to carry the burden of proof constitu-

tionally required insofar as the statements pertained to a matter of public concern.[27]

Before turning to the defendants' claims regarding defamation, we note that the Appellate Court's opinion sets forth the following additional relevant facts and procedural history, namely, that the trial court "found three statements made by the defendants to be defamatory. Specifically, it found two sets of statements made to the plaintiff's friends . . . Vrabel and [Melissa] DePallo, to be defamatory: (1) 'Janice Smolinski told [Vrabel] on several occasions that [the plaintiff] "did something to her son" and that "she believes that either [the plaintiff] or someone in her family murdered her son"; and (2) 'Janice Smolinski approached [DePallo] and said you do not know what [the plaintiff] is capable of; she said she does not believe [the plaintiff] killed her son, personally, but she knows where he is and [Janice] Smolinski thought "she's involved." The court also found the following statement made by the defendants to an unidentified man at the plaintiff's gym to be defamatory: '[The plaintiff] drove to her gym, the defendants were following her, and [the plaintiff] says, "a guy came and said those people (referring to the Smolinskis) just followed you in and said you were a murderer." ' "[28] *Gleason* v. *Smolinski*, supra, 149 Conn. App. 308.

Citing its decision in *Murphy* v. *Lord Thompson Manor, Inc.*, 105 Conn. App. 546, 552, 938 A.2d 1269, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008),[29] for the applicable standard of review, the Appellate Court upheld, as not clearly erroneous, the trial court's conclusion that these statements were not " 'mere opinion' " that could not form the basis for a defamation claim, insofar as the plaintiff " 'was said to be a murderer or involved in a situation where murder occurred.' " *Gleason* v. *Smolinski*, supra, 149 Conn. App. 310. The Appellate Court also concluded that the trial court did not commit clear error in determining that the defendants had acted with actual malice in making these statements in reckless disregard for the truth, thus supporting the plaintiff's claim for punitive damages. Id., 311. Finally, the Appellate Court rejected the defendants' contention that the statements, if defamatory, did not support a claim for damages because the plaintiff had suffered "no resulting reputational harm," reasoning that injury was presumed because they were defamatory per se under *Urban* v. *Hartford Gas Co.*, supra, 139 Conn. 308. See *Gleason* v. *Smolinski*, supra, 311–12.

Our consideration of the defendants' specific challenges to the Appellate Court's decision is informed by the following general principles. Although defamation[30] claims are rooted in the state common law, their elements "are heavily influenced by the minimum standards required by the [f]irst [a]mendment." *Celle* v.

*Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); see also, e.g., *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 348–49, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 283–84, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Flamm* v. *American Assn. of University Women*, 201 F.3d 144, 149–50 (2d Cir. 2000). At common law, "[t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."[31] (Internal quotation marks omitted.) *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 627–28, 969 A.2d 736 (2009).

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). It is well settled that "for a claim of defamation to be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury." (Citations omitted.) Id., 228–29. Each statement furnishes a separate cause of action and requires proof of each of the elements for defamation. See id., 217.

Beyond these common-law principles, there are numerous federal constitutional restrictions that govern the proof of the tort of defamation, the applicability of which varies with "(a) the status of the plaintiff as a public or private figure, and (b) whether the subject of the speech is a matter of public or private concern. Thus, there are four possibilities: (1) public person/public matter, (2) private person/public matter, (3) public person/private matter, and (4) private person/private matter." *Weldy* v. *Piedmont Airlines, Inc.*, 985 F.2d 57, 63 (2d Cir. 1993). We previously have noted that, under *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 254, if "the plaintiff is a public figure . . . the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . Additionally, to recover punitive damages, a plaintiff must prove actual malice, regardless of whether the plaintiff is a public figure." (Citations omitted; internal quotation marks omitted.) *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 628; see also *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 350; *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 148–49. To sustain an award of punitive damages, the plaintiff

must prove actual malice by clear and convincing evidence, which "denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." (Internal quotation marks omitted.) *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 536–37, 368 A.2d 125 (1976). The other elements of defamation, including the subsidiary historical facts, are, however, subject to proof under the preponderance of the evidence standard. *Holbrook* v. *Casazza*, 204 Conn. 336, 358–59, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988); *Miles* v. *Perry*, 11 Conn. App. 584, 588–89, 529 A.2d 199 (1987).[32]

Before turning to the defendants' claims in the present appeal, we observe four touchstones for our analysis. First, the parties do not dispute for purposes of the defamation claim that the oral statements at issue, which pertain to the plaintiff's role in Bill's death or disappearance, implicate a matter of public concern for first amendment purposes.[33] See *Holloway* v. *American Media, Inc.*, supra, 947 F. Supp. 2d 1261 n.10; see also, e.g., *Miles* v. *Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998) (child murder investigation matter of public concern for purposes of defamation claims arising from article in tabloid newspaper indicating that neighbor is pedophile); *Shoen* v. *Shoen*, 292 P.3d 1224, 1229–30 (Colo. App. 2012) (defendant's statement in television interview that plaintiff was "capable" of arranging murder of his brother's wife implicated matter of public concern, triggering state's higher burden of proof in defamation action). Second, with no serious argument to the contrary, we treat the plaintiff as a private figure. Third, we assume, without deciding, that the Appellate Court properly agreed with the plaintiff's characterization of the statements at issue as purported statements of opinion that were, in reality, actionable statements of implied fact under, for example, *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 448 A.2d 1317 (1982), and *Lester* v. *Powers*, 596 A.2d 65 (Me. 1991).[34] Finally, there is no dispute that the subject matter of these statements is defamatory per se because they charge crimes punishable by imprisonment and, therefore, the plaintiff is relieved from the burden of pleading and proving damages to her reputation. See, e.g., *Skakel* v. *Grace*, 5 F. Supp. 3d 199, 206–207 (D. Conn. 2014); see also footnote 31 of this opinion.

A

Standard of Appellate Review

Relying on *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 646 A.2d 92 (1994), cert. denied, 513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995), the defendants first contend that the Appellate Court improperly applied the clearly erroneous standard of review, rather than engaging in an independent exami-

nation of the entire record to ensure that the judgment did not violate their first amendment rights. The plaintiff argues that the proper standard of review is abuse of discretion. We conclude that appellate review of the trial court's conclusions with respect to defamation in this case requires us to review the underlying findings of historical fact for clear error, but also to engage in an independent review of those determinations by the trial court that carry constitutional significance, such as whether those facts constituted clear and convincing evidence of actual malice justifying an award of punitive damages.

In *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 525–36, this court followed, inter alia, *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984), and *Holbrook* v. *Casazza*, supra, 204 Conn. 343, in declining to apply the clearly erroneous standard in reviewing a trial court's "determination of actual malice in a case governed by *New York Times Co.* v. *Sullivan* [supra, 376 U.S. 254]," namely, one implicating defamation claims by a public figure on a matter of public concern. (Internal quotation marks omitted.) *Woodcock* v. *Journal Publishing Co.*, supra, 525–36. Rather, consistent with the analysis applied in other first amendment contexts; see part I of this opinion; the court observed that, in "reviewing defamation actions, an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . Because freedom of expression occupies the highest rung of the hierarchy of [f]irst [a]mendment values, and is entitled to special protection . . . [t]he rule of independent review assigns to appellate courts in first amendment freedom of expression cases, a constitutional responsibility that cannot be delegated to the trier of fact, whether the [fact-finding] function be performed in the particular case by a jury or by a trial judge."[35] (Citations omitted; internal quotation marks omitted.) Id., 536.

This independent review does not, however, mean that the reviewing court may disregard the facts as found by the trier of fact. This court has acknowledged that the independent review required by *Bose Corp.* v. *Consumers Union of United States, Inc.*, supra, 466 U.S. 499–500, "preserves the due regard that is ordinarily given to the trial judge's opportunity to observe the demeanor of the witnesses. . . . In a footnote, the . . . court [in *Bose Corp.*] clarified that [t]he independent review function is not equivalent to a de novo review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for [the] plaintiff. . . . The court noted that, apart from the finding of actual malice, to which the rule of independent review applies, the

other findings of fact in a defamation case are properly tested under the clearly erroneous standard of review."[36] (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Holbrook* v. *Casazza*, supra, 204 Conn. 344. These other findings of fact include, for example, the falsity of the factual statement that constitutes the alleged defamation. See *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 149.

Thus, although "[w]e have considerable latitude in deciding whether the evidence supports a finding of actual malice," the "constitutionally based rule of independent review does not mean that we disregard credibility determinations of the trier of fact. . . . Deference to factual determinations that turn on credibility assessment is essential because of the fact finder's unique opportunity to observe and weigh witness testimony." (Citations omitted; internal quotation marks omitted.) *Tan* v. *Le*, 177 Wn. 2d 649, 669–70, 300 P.3d 356 (2013), cert. denied,   U.S.   , 134 S. Ct. 941, 187 L. Ed. 2d 784 (2014); see also *Dacey* v. *Connecticut Bar Assn.*, supra, 170 Conn. 540 ("[T]he credibility of the witnesses and the weight to be accorded their testimony is a matter for the jury to decide. Further, we refrain from choosing among inferences as this is another jury function."). Thus, we defer to the trier's findings with respect to, for example, a party's actual knowledge of a statement's falsity, or whether he acted in good faith in publishing a statement later deemed defamatory. See *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 638–39; see also *Nelson* v. *Tradewind Aviation, LLC*, 155 Conn. App. 519, 540–41, 111 A.3d 887 (2015) (upholding actual malice determination because jury reasonably could have concluded that defendant knowingly made false statements about plaintiff's employment history with improper motive); *Tan* v. *Le*, supra, 671–72 (deferring to jury's finding of actual malice as based on decision not to credit defendants' testimony that they had acted in good faith when publishing defamatory articles). We conclude, therefore, that the Appellate Court; see *Gleason* v. *Smolinski*, supra, 149 Conn. App. 310–11; improperly applied the clearly erroneous standard of review without tailoring it to the specific trial court determinations at issue, in particular the trial court's actual malice finding, which was of constitutional import given the punitive damages awarded to the plaintiff. See, e.g., *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 348–49; see also footnote 32 of this opinion.

B

Actual Malice and Constitutional Adequacy of Proof

We finally turn to the defendants' burden of proof claim, which relies on *Obsidian Finance Group, LLC* v. *Cox*, supra, 740 F.3d 1284, for the proposition that when, as in this case, an allegedly defamatory statement

relates to a matter of public concern, the first amendment requires the plaintiff, even if *not* a public figure, to prove by clear and convincing evidence that the defendant acted with actual malice in making it. To this end, the defendants contend that we should engage in an independent review of the record, and conclude that they lacked the requisite actual malice insofar as they were reasonable in believing that the plaintiff was involved in Bill's disappearance because the plaintiff was the last person to see him alive, and refuses to take a polygraph to clear herself as a suspect in his disappearance and, they argue, admits that she continues to withhold information from the police. As the plaintiff acknowledges, the defendants in essence "claim that [she] had the burden of proving that she was innocent of murder in order to prevail on her defamation claim."

In response, the plaintiff relies on *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 112 and n.6, and *Atwater* v. *Morning News Co.*, 67 Conn. 504, 520, 34 A. 865 (1896), for the proposition that, as a private figure, she does not bear the burden of proving the falsity of the defamatory statements, insofar as Connecticut follows the common-law rule that the truth is an affirmative defense in defamation cases involving private citizens. The plaintiff claims that the defendants' arguments to the contrary would cause a radical change in the law of defamation, because it would render any victim of defamation a "limited purpose public figure" under *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 323, resulting solely from the publication of the allegedly tortious statements.[37] The plaintiff then contends that, "[e]ven if this court were to adopt the defendants' radical position . . . it would not alter the result in this case," insofar as the trial court found that the defendants acted in reckless disregard for the truth in making the statements at issue, given evidence in the record that was sufficient to establish she knew nothing about Bill's disappearance. We agree with the defendants, insofar as they claim that reversal is required because the plaintiff failed to prove the falsity of the allegedly defamatory statements.

We note at the outset that this claim was not preserved in the trial court. Nevertheless, and in the absence of a procedural objection by the plaintiff, we exercise our discretion to review it pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, despite the defendants' failure to ask that we do so, because their main brief otherwise meets the predicates for *Golding* review insofar as it has "present[ed] a record that is [adequate] for review and affirmatively [demonstrates] that [their] claim is indeed a violation of a fundamental constitutional right."[38] (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014).

Our independent research demonstrates that neither

of the parties' briefs provides a completely accurate recitation of the law governing the proof of defamation claims like those at issue in the present case, namely, claims made by private figure plaintiffs, but relating to matters of public concern.[39] The defendants rely on the decision of the United States Court of Appeals for the Ninth Circuit in *Obsidian Finance Group, LLC* v. *Cox*, supra, 740 F.3d 1284, for the proposition that, when an allegedly defamatory statement relates to a matter of public concern, a private plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice in making it. *Obsidian Finance Group, LLC*, does not, however, stand for such a broad proposition. Indeed, the defendants' reading of that case is directly foreclosed, as a matter of federal constitutional law, by the United States Supreme Court's landmark decision in *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 346, which rejected a claim that the actual malice standard adopted in *New York Times Co.* should extend to defamation actions brought by private individuals, even in cases concerning matters of public concern.[40] Instead, the Supreme Court held in *Gertz* that "the [s]tates should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual"; id., 345–46; and that, "so long as they do not impose liability without fault, the [s]tates may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id., 347; see also id., 348 (requiring proof of at least negligence "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation"). The court held, however, that this negligence standard applies only to "compensation for actual injury," and that "[s]tates may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." Id., 349.

The defendants' citation to *Obsidian Finance Group, LLC*, does, however, point us indirectly to the proper legal standard with respect to the proof of defamation claims brought by private figures relating to matters of public concern, insofar as it cites the decision of the United States Court of Appeals for the Second Circuit[41] in *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 144. See *Obsidian Finance Group, LLC* v. *Cox*, supra, 740 F.3d 1291. In *Flamm*, the Second Circuit extended the rule of *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986), to nonmedia defendants[42] and held that, when an allegedly defamatory statement is made about a plaintiff who is a private figure, but relates to a matter of public concern, those "defamatory statements must be provably false, and the plaintiff must bear the burden

of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern." *Flamm* v. *American Assn. of University Women*, supra, 149; see also *Albert* v. *Loksen*, 239 F.3d 256, 268 n.10 (2d Cir. 2001) (noting that New York common-law rule requiring defendant to plead and prove truth "survives in defamation suits by private-figure plaintiffs concerning statements on purely private matters," but stating that "[f]or constitutional reasons . . . a private-figure plaintiff . . . generally has the burden of proving falsity, at least where the allegedly defamatory statements concern a matter of public interest" [citation omitted]).

In describing this burden shift away from the common-law rule, followed in Connecticut, that falsity is presumed and the truth is an affirmative defense; see, e.g., *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 112; the United States Supreme Court acknowledged that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so. Nonetheless, the [c]ourt's previous decisions on the restrictions that the [f]irst [a]mendment places upon the common law of defamation firmly support our conclusion here with respect to the allocation of the burden of proof. In attempting to resolve related issues in the defamation context, the [c]ourt has affirmed that [t]he [f]irst [a]mendment requires that we protect some falsehood in order to protect speech that matters. . . . To provide breathing space . . . for true speech on matters of public concern, the [c]ourt has been willing to insulate even demonstrably false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Philadelphia Newspapers, Inc.* v. *Hepps*, supra, 475 U.S. 778. The court further observed that this burden shift "adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation. The plaintiff must show fault. A jury is obviously more likely to accept a plaintiff's contention that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false. As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted."[43] Id.

Our review of the record indicates that neither the trial court nor the Appellate Court ever expressly considered whether the plaintiff proved the falsity of the defamatory statements under any standard of proof.[44] This indicates a violation of the plaintiff's first amendment rights under *Philadelphia Newspapers, Inc.* v. *Hepps*, supra, 475 U.S. 778–79, and *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 149, thus

satisfying the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 10 of this opinion. Turning to *Golding*'s fourth prong, however, the plaintiff contends that reversal of the defamation judgment is not required insofar as the Appellate Court upheld, as not clearly erroneous, the trial court's conclusion that the defendants made the statements at issue with actual malice by acting with reckless disregard for the truth, thus implying their falsity.[45] To this end, the plaintiff argues that the "defendants simply had no factual basis whatsoever for the accusations they made, yet they made them anyway and did so not only with knowledge that they would injure the plaintiff but for the specific and articulated purpose of 'break[ing] her.' " In support of this argument, she cites her own testimony as sufficient evidence that she "had no knowledge whatsoever concerning [Bill's] disappearance . . . ." Having reviewed the record, we disagree with the plaintiff's argument that it supports the trial court's finding of actual malice.

"As we previously have noted, actual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. . . . Further, proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of actual malice . . . although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity. . . .

"Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact. . . . The proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements and whether he has grounds for such belief. . . . Notably, however, a trial court is not required merely to accept a defendant's self-serving assertion that he published a defamatory statement without knowing that it was false. . . . As the United States Supreme Court aptly stated: The defendant in a defamation action . . . cannot . . . automatically [e]nsure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. . . .

"Although whether a defendant has published a false statement with reckless disregard for its truth is not

easily captured in a simple definition, we have held that reckless disregard may be found when an individual publishes defamatory statements with a high degree of awareness of . . . probable falsity . . . or . . . entertained serious doubts as to the truth of [the] publication . . . . Moreover, [a] refusal to retract a statement that has been demonstrated to be false and defamatory might be relevant in showing recklessness at the time the statement was published." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 637–39.

Turning to the record of the present case, we conclude that the plaintiff did not establish actual malice under any standard of proof. See footnote 44 of this opinion. Unlike in our past cases wherein we have upheld findings of actual malice, neither the trial court nor the plaintiff cite any evidence in the record indicating that the defendants' allegations that the plaintiff had some role in, or knowledge about, Bill's disappearance were made, as the trial court found, reckless disregard for the truth. Further, our review of the record does not yield any evidence to support the trial court's determination that "[w]e do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture," particularly given that the plaintiff never challenged at trial the defendants' personal knowledge of the factual basis for their statements. Indeed, the evidence in the record supports the opposite conclusion, notwithstanding the fact that there need not be a "single smoking gun proving actual malice," and that even the "clear and convincing evidence standard does not require defendants to admit on the record they entertained serious doubts as to the truth of their allegations." (Internal quotation marks omitted.) *Tan* v. *Le*, supra, 177 Wn. 2d 674.

First, the plaintiff and Bill ended their romantic relationship within just a few days of his disappearance, and the morning he disappeared, he was involved in an altercation at DePallo's house, when he put a ladder up to the bedroom where the plaintiff was staying, when he could not reach her by telephone.[46] That night, Bill also left multiple threatening telephone messages for Sorensen, who was his apparent rival for the plaintiff's affections. Indeed, an affidavit in support of an arrest warrant for Janice Smolinski,[47] and the plaintiff's own testimony,[48] confirms that the Waterbury police have considered the plaintiff as a suspect in Bill's disappearance, and have not yet ruled her out because she has refused, on the advice of counsel, to take a polygraph examination.[49] Moreover, the defendants have searched for the truth into Bill's disappearance, and have retained Todd Lovejoy, a retired Waterbury police officer, as a private detective to help them; the plaintiff has not responded to Lovejoy's attempts to speak to her about Bill's disappearance. Finally, the defendants then

became aware of the plaintiff's own conduct, along with that of Vrabel, in removing the missing person flyers in the town of Bethany, which, as the trial court found, triggered the defendants' more intense flyer campaign that gave rise to the intentional infliction of emotional distress claim addressed in part I of this opinion. In comparison to the other cases in which we have upheld findings of actual malice,[50] these circumstances indicate that the defendants did not act with reckless disregard for the truth in stating to other people that the plaintiff, at the very least, knows more than she is saying about Bill's disappearance.[51]

Although it would be probative evidence if there were other evidence of actual malice, the acrimony between the parties, including Janice Smolinski's expressed desire to "break" the plaintiff and have her reveal information about Bill's disappearance, does not suffice by itself to fill this evidentiary void. "[E]vidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith." (Internal quotation marks omitted.) *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 544; see also, e.g., *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 638 ("proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of actual malice" [internal quotation marks omitted]). Accordingly, we conclude that the trial court's failure to conduct the falsity analysis required by the first amendment requires a new trial on the defamation claim.[52]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court for a new trial on the claims of intentional infliction of emotional distress and defamation.

In this opinion ROGERS, C. J., and PALMER, McDONALD and ESPINOSA, Js., concurred.

[1] We note that, although William Smolinski, Jr., was known to his family and friends as Billy; see *Gleason* v. *Smolinski*, 149 Conn. App. 283, 286–87, 88 A.3d 589 (2014); both the trial court and the Appellate Court referred to him as Bill. For the sake of consistency with those opinions, we refer to William Smolinski, Jr., as Bill.

[2] We note that B and B Transportation, Inc., was also a plaintiff in the underlying action but subsequently withdrew its claims against the defendants. See *Gleason* v. *Smolinski*, 149 Conn. App. 283, 286 n.2, 88 A.3d 589 (2014). For the sake of simplicity, we refer to Gleason as the plaintiff.

[3] As noted by the Appellate Court, the "plaintiff . . . also [filed claims against] John Murray, the owner, publisher and editor of a monthly newspaper, the Waterbury Observer, for invasion of privacy and intentional infliction of emotional distress. Murray filed a motion to strike the claims against him, which the court granted on July 20, 2009. He then moved for summary judgment because all of the counts directed at him had been stricken by the court. The court granted Murray's motion for summary judgment on January 12, 2010. Thus, none of the claims [on] appeal pertain to Murray." (Citation omitted.) *Gleason* v. *Smolinski*, 149 Conn. App. 283, 285 n.1, 88 A.3d 589 (2014). For the sake of simplicity, we refer to Janice Smolinski and Bell collectively as the defendants and individually by name.

[4] We granted the defendants' petition for certification to appeal limited to the following issues: "1. Did the Appellate Court properly conclude that the defendants' . . . claim of protected speech [under the first amendment to the United States constitution] failed to satisfy the third prong of the test for review of unpreserved claims set forth in *State* v. *Golding*, 213 Conn. 213, 239–40, 567 A.2d 823 (1989)?

"2. Did the Appellate Court properly affirm the trial court's determination that the defendants were liable for defamation per se of the . . . plaintiff?" *Gleason* v. *Smolinski*, 312 Conn. 920, 94 A.3d 1201 (2014).

[5] "The first amendment to the United States constitution provides in relevant part: 'Congress shall make no law . . . abridging the freedom of speech . . . .'

"The first amendment prohibition against laws abridging the freedom of speech is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution." *State* v. *Moulton*, 310 Conn. 337, 341 n.3, 78 A.3d 55 (2013).

In a footnote, the defendants raise a separate claim under article first, § 4, of the Connecticut constitution, arguing that "the state constitutional protection for free speech should be no less protective of the defendants' speech." Because the defendants' state constitutional claim is perfunctorily briefed without an independent analysis consistent with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we confine our analysis in this opinion to their federal claim. See, e.g., *State* v. *Johnson*, 288 Conn. 236, 244 n.14. 951 A.2d 1257 (2008).

[6] As the Appellate Court noted, "[t]he plaintiff reported to Waterbury police Sergeant Edward Apicella on August 3, 2005, during the course of the police department's investigation of [Bill's] disappearance that . . . 'prior to her relationship with Bill she was having an affair with . . . Sorensen and she is currently continuing to have that affair. She said that she believed Bill suspected [or] knew of her having an affair with [Sorensen] for a time but she didn't actually tell him until she went on a trip to Florida with Bill. [The plaintiff] said that it came to [a head] when they went on a trip to Florida the week prior to August 22, 2004. She said that she was getting phone calls on her cell phone . . . while they were on a beach in Florida. Bill grabbed the cell phone from her and was trying to see who was calling her. [The plaintiff] said that when she tried to get the phone from him he hit her and they had a fight. She began to yell at people on the beach to call the police because Bill was not [returning] her cell phone. She never made a report to the police and she eventually got her phone back. Bill told her that he wanted to end the relationship because he wanted more out of it. . . . She agreed and they returned from Florida [on Sunday, August 22, 2004]. [The plaintiff] went on to say that she had been married three times, she liked Bill but she didn't need to baby-sit a [thirty-one] year old guy who liked to drink and fight. She said that Bill used to . . . get into fights all the time. She also claimed that Bill started to smoke drugs . . . . She said she was already involved with Sorensen as well. It was [Bill's] idea to break up but she agreed.' " *Gleason* v. *Smolinski*, supra, 149 Conn. App. 287 n.3.

[7] As the Appellate Court noted, Waterbury police Sargent Edward Apicella's police report stated that the plaintiff "said that she got a call from [Sorensen] saying that someone left a message on his answering machine that said: 'You better watch your back at all times.' [The plaintiff] heard the message and she said that it was Bill . . . ." *Gleason* v. *Smolinski*, supra, 149 Conn. App. 287 n.3.

[8] "The evidence shows that the missing person posters that were hung by the defendants consisted of photographs and physical descriptions of Bill . . . as well as information about his disappearance, an offer of a reward, and contact information to report tips to the police." *Gleason* v. *Smolinski*, supra, 149 Conn. App. 288 n.4.

[9] The defendants also claimed that: (1) "the trial judge exhibited bias and partiality that constituted plain error"; (2) "the [trial] court erred in relying on hearsay statements to determine that the defendants intended to inflict emotional distress upon the plaintiff"; (3) "there was insufficient evidence to support the finding of intentional infliction of emotional distress"; and (4) "the [trial] court erred in awarding compensatory and punitive damages to the plaintiff." *Gleason* v. *Smolinski*, supra, 149 Conn. App. 286. The Appellate Court rejected these other claims, and we do not address them further because they are not before us in this certified appeal. See footnote 4 of this opinion.

[10] A party "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate

to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, 317 Conn. 773, 780–81, A.3d (2015) (modifying third prong). "The test set forth in *Golding* applies in civil as well as criminal cases." *Chatterjee* v. *Commissioner of Revenue Services*, 277 Conn. 681, 694 n.15, 894 A.2d 919 (2006).

We note that in *In re Yasiel R.*, supra, 317 Conn. 780–81, we recently held that "a party satisfies the third prong of *Golding* if he or she makes a showing sufficient to establish a constitutional violation," and that this court's "use of the word 'clearly' in describing the requirements under that prong of the test is unnecessary and misleading." See also id., 781 (noting that "we have previously employed *Golding* to decide constitutional questions of first impression," and rejecting conclusion that *Golding* required appellant to "reference prior Connecticut precedent to be successful under the third prong").

[11] The defendants also argue that the Appellate Court improperly concluded that the first amendment issue was unpreserved. Without providing a citation to the record, the defendants contend that they raised this issue before the trial court—which did not address it in its memorandum of decision. Our review of the record indicates that this issue is mentioned for the first time in a postjudgment motion for articulation, which, as the trial court observed, is not a proper way to preserve an issue for appellate review. Cf. *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 633–34, 99 A.3d 1079 (2014) ("[r]aising an issue for the first time in a motion to reargue will not preserve that issue for appellate review").

[12] The defendants further contend that the trial court improperly failed to defer to the rulings of a different judge, *Hon. Robin L. Wilson*, earlier in the case, which, in striking the claims against the defendant John Murray; see footnote 3 of this opinion; concluded that the issues relating to the plaintiff's relationship with Bill, and his ultimate disappearance were matters of legitimate public concern for purposes of tort immunity under the first amendment. We disagree. Even if we assume, without deciding, that Judge Wilson's legal conclusions with respect to Murray's motion to strike were directly applicable to the plaintiff's claims against the remaining defendants, under the law of the case doctrine, Judge Corradino, who conducted the court trial in this case, was not bound to follow them. See, e.g., *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 322, 63 A.3d 896 (2013).

[13] At oral argument before this court, the plaintiff clarified that her statement in her brief that it is "far from clear that [the defendants'] conduct in this case fell within the protections of the first amendment," was *not* intended as a restrictive interpretation of the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40, which would operate akin to case law arising under 42 U.S.C. § 1983 by focusing the availability of relief on the existence of clearly governing constitutional principles, rather than the clarity of the legal conclusions arising from a review of the facts in the record. We note that this position is consistent with our recent decision in *In re Yasiel R.*, 317 Conn. 773, 780–81, A.3d (2015). See footnote 10 of this opinion.

[14] By way of background, we note that "[i]n order for the plaintiff to prevail in a case for liability . . . [alleging intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury. . . .

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and

to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 526–27, 43 A.3d 69 (2012); see also *Russo* v. *Hartford*, 184 F. Supp. 2d 169, 188 (D. Conn. 2002) ("[t]he standard in Connecticut to demonstrate extreme and outrageous conduct is stringent").

[15] Substantial portions of the defendants' brief and oral argument before this court appear to reargue the facts as found by the trial court, in the course of urging us to undertake an "independent" review of the record under *State* v. *Golding*, supra, 213 Conn. 239–40. Consistent with the first amendment analyses in, for example, *State* v. *Krijger*, supra, 313 Conn. 447–49, and *DiMartino* v. *Richens*, supra, 263 Conn. 661–62, our review of the defendants' unpreserved constitutional claims under *Golding* does not permit us to disregard the trial court's findings of historical fact resolving conflicting evidence in favor of our own view of the factual record, or to make our own findings when the record reveals conflicting or inconclusive evidence on a factual point. See, e.g., *State* v. *Lawrence*, 282 Conn. 141, 157–58, 920 A.2d 236 (2007); *State* v. *Brunetti*, 279 Conn. 39, 55–56, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Rather—and the dissent's characterization of our analysis notwithstanding—we consider only whether the trial court's factual findings were made in accordance with the principles of the first amendment.

[16] *Hustler Magazine, Inc.* v. *Falwell*, supra, 485 U.S. 46, arose from a magazine's publication of a parody cartoon depicting a prominent minister having sexual relations with his mother in an outhouse. In that case, the United States Supreme Court extended *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and concluded that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc.* v. *Falwell*, supra, 56. The court observed that, although "the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently 'outrageous.' But in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the [f]irst [a]mendment." Id., 53. In particular, the court noted that, in *Garrison* v. *Louisiana*, 379 U.S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964), it had held that "even when a speaker or writer is motivated by hatred or ill will his expression was protected by the [f]irst [a]mendment." *Hustler Magazine, Inc.* v. *Falwell*, supra, 53; see also id., 53–54 (noting that holding to contrary would lead to liability chilling work of political cartoonists and satirists, who often use offensive caricatures in their work).

The Supreme Court rejected the minister's urging to use an "outrageousness" standard to distinguish the cartoon at issue in *Hustler Magazine, Inc.*, from "more traditional political cartoons," stating that the term "outrageousness" does not furnish a "principled standard" for making that distinction, given that "[o]utrageousness in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An outrageousness standard thus runs afoul of our [long-standing] refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. See *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 910 [102 S. Ct. 3409, 73 L. Ed. 2d 1215] (1982) ([s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action)." (Internal quotation marks omitted.) *Hustler Magazine, Inc.* v. *Falwell*, supra, 485 U.S. 55.

[17] The court observed that, however "hurtful" their conduct, "the church members had the right to be where they were. Westboro alerted local authorities to its funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some [1000] feet from the church, out of the sight of those at

the church. The protest was not unruly; there was no shouting, profanity, or violence." *Snyder* v. *Phelps*, supra, 562 U.S. 457; see also id. ("[A]ny distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very spot where Westboro stood, holding signs that said 'God Bless America' and 'God Loves You,' would not have been subjected to liability. It was what Westboro said that exposed it to tort damages.").

[18] One commentator aptly observes that, "[w]hile public concern in *Snyder* represents a constitutional requirement grafted onto the common law [of intentional infliction of emotional distress] to provide a check on the subjective and equally pliable element of extreme and outrageous conduct, it may well be that the two concepts are simply inversely correlated. Specifically, the more the speech in question is about a matter of public concern, the less likely it is for publication of that speech to be deemed extreme and outrageous. . . . In this sense, then, initial judicial resolution of the constitutional public-concern question largely dictates how courts will later resolve the [common-law] question of whether publication of the speech was extreme and outrageous." C. Calvert, "Public Concern and Outrageous Speech: Testing the Inconstant Boundaries of IIED and The First Amendment Three Years After *Snyder* v. *Phelps*," 17 U. Pa. J. Const. L. 437, 475–76 (2014).

[19] For additional illustrations of this well established principle, see, for example, *Best* v. *Berard*, 776 F. Supp. 2d 752, 756–58 (N.D. Ill. 2011) (plaintiff's arrest for driving with suspended license was matter of public concern barring intentional infliction of emotional distress claim arising from her appearance on reality television program); *Hobbs* v. *Pasdar*, 682 F. Supp. 2d 909, 927–28 (E.D. Ark. 2009) ("West Memphis Three" murder case issue of public concern); *Miles* v. *Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998) (child murder investigation is matter of public concern for purposes of defamation claims arising from tabloid article indicating that plaintiff, who was victim's neighbor, is pedophile); *Shoen* v. *Shoen*, 292 P.3d 1224, 1229–30 (Colo. App. 2012) (defendant's statement on television that plaintiff was "capable" of arranging murder of his brother's wife implicated matter of public concern, triggering higher burden of proof in defamation action); *Wiemer* v. *Rankin*, 117 Idaho 566, 570–71, 790 P.2d 347 (1990) (article about inadequate investigation related to matter of public concern for purposes of husband's defamation claims arising from shooting death of wife); *Dumas* v. *Koebel*, 352 Wis. 2d 13, 29–30, 841 N.W.2d 319 (App. 2013) (first amendment barred school bus driver's claims for, inter alia, intentional infliction of emotional distress, which she brought against broadcaster who had confronted her about past misdemeanor prostitution conviction during news story intended to "inform the public that there were bus drivers who had criminal histories . . . and question whether the school district was thoroughly researching the backgrounds of bus drivers"), review denied, 354 Wis. 2d 863, 848 N.W.2d 859 (2014).

[20] The trial court discussed this finding in greater detail, crediting the testimony of Brad Cohen, the plaintiff's supervisor and employer at B and B Transportation, Inc., that "in traveling around several towns the posters were generally 'well spaced out'—'at different poles.' However, on [the plaintiff's] school bus run and at the house where she lived 'there were multiple posters on each and every telephone pole, on guardrails.' He said you could easily do a run (school bus route) by following the posters—'they led down every street, every side street, every nook and cranny of . . . these places.'" The trial court also credited Cohen's testimony that "posters were placed at the entrance to his school bus transportation business on either side of the driveway—a driveway the plaintiff would have to enter and exit at least four times daily." Finally, the trial court credited the testimony of Melissa DePallo, a friend of the plaintiff, that the plaintiff's school bus "run was definitely targeted with flyers. [The plaintiff] lived with [DePallo] for a short time. She lives on a dead end street and her house 'was definitely bombarded with flyers.' There were no other flyers on the whole street; the pole in front of her house had twenty posters placed on it. When they were taken down, they went up the next day, it went on not just for the few months [the plaintiff] lived with DePallo, it went on for a year according to her. [The plaintiff] testified that she lived with another friend who testified on her behalf and that person's house was saturated with posters."

The trial court also noted that "no evidence was presented as to why the [defendants] could in fact believe it was a necessary aid to the location of Bill . . . to [hang] posters along [the plaintiff's] bus route. It was under-

standable to do so along Route 63 which provides a direct connection between the Waterbury area and [the city of] New Haven but saturation of other areas [in the towns] of Woodbridge and Bethany do not appear to fall in this category. [The plaintiff] lived and worked in the Woodbridge and Bethany area. But apart from a short period of employment at [B and B Transportation, Inc.] and his dating of [the plaintiff] who lived in Woodbridge nothing was presented to [indicate] Bill . . . had any other connection to these towns.

"From another perspective it cannot be deduced from the evidence and testimony that the concentration of poster activity where [the plaintiff] lived and worked only commenced in reaction to [the plaintiff's] tearing down posters in that area. The [defendants] ordered thousands of posters and hung many in various areas of Connecticut's western part. But the poster hanging activity in towns where [the plaintiff] worked and lived was apparently done from the beginning of the poster hanging activity. The removal of posters from Woodbridge, Bethany, and [the town of] Ansonia began to be noticed in just a couple of weeks after their being put up by the [defendants]."

[21] The dissent states that "the trial court found that the defendants' targeting of the plaintiff, in the context of their other intimidating activities, was not a bona fide expression to the public of a message that the first amendment protects." The dissent also criticizes us for "disregarding" this "crucial finding," namely, that the defendants' sole intent was to "harass . . . ." We respectfully disagree with the dissent's reading of the record and the trial court's findings. Nothing in the trial court's memorandum of decision indicates that it considered the first amendment in deciding this case. We, of course, do not fault the trial court for this. The first amendment claims were not properly preserved and must be reviewed on appeal pursuant to *Golding*.

The dissent also appears to contend that the defendants' first amendment claims were properly preserved in the trial court, rendering *Golding* review unnecessary because a "review of the trial court opinion reveals that the trial court did consider free speech issues when deciding this matter." We do not suggest that the trial court was completely unaware that the general subject matter of this case has first amendment implications. The dissent's discussion of the trial court's references to the defendants' free speech rights focuses, however, on conduct the propriety and protected nature of which is not at issue in this appeal, namely, the defendants' rights to speak to law enforcement authorities or the public about details surrounding Bill's disappearance. There is nothing in the trial court's opinion indicating that it considered the first amendment implications of the defendants' flyer campaign, which were a substantial basis for the plaintiff's intentional infliction of emotional distress claim.

This, of course, explains why the Appellate Court considered the defendants' first amendment claims under the *Golding* bypass that is available for *unpreserved* constitutional claims. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 289–90. It is, of course, this very analysis that formed the basis for the first question that we certified in this appeal, namely: "Did the Appellate Court properly conclude that the defendants' first amendment claim of protected speech failed to satisfy the third prong of the test for review of unpreserved claims set forth in *State* v. *Golding*, [supra, 213 Conn. 239–40]?" *Gleason* v. *Smolinski*, 312 Conn. 920, 94 A.3d 1201 (2014). The dissent's attempt to litigate preservation, with no argument on this point from the parties, is at drastic odds with the well settled procedures that we employ in considering certified appeals from judgments of the Appellate Court, namely, that "the focus of our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification, and we will ordinarily consider these issues in the form in which they have been framed in the Appellate Court." (Internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007); see also id., 222–23 (declining to consider claim that evidence was not hearsay in certified appeal because that argument, although properly preserved at trial, was neither raised before Appellate Court nor mentioned in petition for certification). Accordingly, we conclude that the record demonstrates that the trial court's findings on the claims at issue in the present appeal did not consider, and were not guided by, the relevant first amendment principles.

[22] The New Hampshire court noted that the city "employs [officers] to enforce motor vehicle parking laws and regulations . . . . The [officers] patrol . . . on foot and in marked vehicles, monitoring parking meters and

issuing parking tickets. In December 2012, the [protesters] began protesting parking enforcement . . . . On an almost daily basis, the [protesters] followed closely behind the [officers], identifying expired parking meters and filling the meter before [an officer] could issue a ticket, a process referred to by the [protesters] as a 'save.' When the [protesters] 'save' a vehicle, they leave a card on the vehicle's windshield that [read]: 'Your meter expired! However, we saved you from the king's tariff!' The [protesters] also: videotaped the [officers] from a close proximity; called the [officers] names such as '[fucking] thief,' 'coward,' 'racist,' and '[bitch]'; criticized the [officers] for issuing tickets; encouraged the [officers] to quit their jobs; and waited for the [officers] during their breaks, including waiting outside restrooms. The [protesters] testified that they engage in these activities to protest parking enforcement because they believe that parking is not a criminal act, and that parking tickets are a 'threat against [the] people.' The [officers] testified that they repeatedly asked the [protesters] to stop their activities, complained to the . . . police . . . and reported the [protesters'] activities to the city attorney." *Keene* v. *Cleaveland*, supra, 118 A.3d 255–56.

At an evidentiary hearing, the officers "testified that the close proximity of the [protesters]—sometimes only [one] foot away from them—caused [them] anxiety and made them feel harassed. One [officer] testified that he was sometimes followed on his patrols by two or three of the [protesters] at the same time, and that they followed him so closely that if he turned around, they would bump into him. He ultimately resigned because 'the constant harassment and intimidation [had] started to boil over into [his] personal life and [his] time off,' and he felt he was 'backed into a corner.' Another [officer] testified that she is 'tense and uptight all the time' because of the 'awful anticipation' of 'waiting for [the protesters] to show up,' and claimed that she is unable to do her job because she is 'trying to avoid [the protesters].' A third, who complained that the [protesters] waited outside her car and followed her in and out of city buildings on her breaks, testified that she does not feel safe when the [protesters] follow her at work. She also testified that, on one occasion, one of the [protesters] grabbed her wrist when she attempted to remove one of the . . . cards from a car windshield. She has changed her work schedule to avoid the [protesters], and has considered quitting her job. The [c]ity also offered testimony about the risk to public safety: specifically, that the [protesters] distract the [officers] as they drive on city streets, and that the [protesters] '[dart] across' the street, which the [c]ity asserted could result in pedestrian injuries or vehicle collisions." Id., 256–57.

[23] The New Hampshire Supreme Court remanded the case, however, for consideration of the city's request for injunctive relief, despite the proper dismissal of the tort damages claims, given "the impact of the challenged conduct upon the [c]ity's interests in preserving public safety and protecting the [officers]." *Keene* v. *Cleaveland*, supra, 118 A.3d 261–62. The court held that the trial court had improperly failed to "consider the factual circumstances of the case prior to making its determination as to whether injunctive relief was warranted," given the allegations that the officers felt intimidated and harassed, and that the protesters had acted "with the purpose and intention of preventing the [officers] from doing their jobs." (Internal quotation marks omitted.) Id., 262. The court concluded that in "light of the [c]ity's allegations that the challenged conduct threatens the safety of the [officers], pedestrians, and the motoring public, and given the testimony of the [officers] at the hearing . . . the trial court erred when it failed to consider the particular factual circumstances of the case and whether an injunction should issue based upon the governmental and policy interests asserted by the [c]ity." Id., 263. It determined that the trial court should consider in the first instance whether a content neutral injunction could be fashioned that would protect the officers and the protesters' constitutional rights. Id.

[24] In its reliance on and attempt to distinguish *Keene* v. *Cleaveland*, supra, 118 A.3d 253, the dissent again relies on the finding by the trial court in the present case that the defendants intended to "hound" the plaintiff until she "broke," and engaged in the placement of posters "for the sole purpose of intimidating and harassing the plaintiff . . . ." We respectfully disagree. Consistent with the New Hampshire Supreme Court's conclusion that the protesters' harassing activities were constitutionally protected attempts to persuade the officers to quit their jobs, despite the fact that they caused the targeted officers considerable distress; see footnote 22 of this opinion; the record indicates that the defendants' activities in the present case were consistent with their constitutionally protected activity of persuading the plaintiff to share her knowledge with respect to Bill's disappearance. There

was no finding that the defendants intended to "break" the plaintiff solely out of malice stemming from a purely private dispute; the defendants' persuasive activities more than related to the matter of public concern, namely, solving Bill's disappearance.

[25] Specifically, we acknowledge that the parties had engaged in a confrontation at the Woodbridge police station, and that the trial court apparently credited the plaintiff's testimony that "every time she saw the defendants they would swear at her and call her names," like "ho" and "slut." See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 294.

[26] We disagree with the plaintiff's reliance on *Bhatia* v. *Debek*, 287 Conn. 397, 948 A.2d 1009 (2008), in support of her argument that our conclusion renders false accusations of criminal wrongdoing protected by the first amendment, rather than actionable as claims of defamation or intentional infliction of emotional distress. In our view, the plaintiff's argument sweeps too broadly. First, although an accusation of criminal conduct is topically a matter of public concern, our reading of *Snyder* and contemporary first amendment case law establishes that the public concern inquiry is a significant, but not dispositive, factor in determining whether speech or conduct is constitutionally protected for purposes of tort liability. Indeed, should an accusation be false, the first amendment does not foreclose liability under a defamation theory in a well pleaded and proven case.

Further, in *Bhatia* v. *Debek*, supra, 287 Conn. 404–405, we recognized that the law governing the intentional tort of malicious prosecution "seeks to accommodate two competing and ultimately irreconcilable interests. It acknowledges that a person wrongly charged with criminal conduct has an important stake in his bodily freedom and his reputation, but that the community as a whole has an even more important stake in encouraging private citizens to assist public officers in the enforcement of the criminal law." (Internal quotation marks omitted.) Satisfaction of that tort's elements that the defendant acted both without probable cause, and "with malice, primarily for a purpose other than that of bringing an offender to justice"; id., 404; would suffice to render such conduct unprotected by the first amendment in any event. Cf. *Hustler Magazine, Inc.* v. *Falwell*, supra, 485 U.S. 56 ("public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice' ").

[27] The defendants also claimed that the three allegedly defamatory statements were subject to the "fair comment privilege" as statements of opinion on a matter of public concern. For reasons explained subsequently in this opinion, we need not address this claim. See footnote 34 of this opinion. For discussion of additional claims relating to defamation raised by the defendants, see footnotes 28 and 52 of this opinion.

[28] The defendants argue that the statement made at the gym is not supported by credible evidence because there was no evidence that either of the defendants actually made that statement. For purposes of this certified appeal, we assume, without deciding, that the trial court's finding that the defendants made this statement was supported by sufficient evidence.

[29] In *Murphy*, the Appellate Court reviewed a trial court's finding that the defendant had committed the tort of negligent infliction of emotional distress, and quoted this court's decision in *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 541, 661 A.2d 530 (1995), for the applicable standard of review, namely: "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Murphy* v. *Lord Thompson Manor, Inc.*, supra, 105 Conn. App. 552.

[30] "Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel* v. *Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014).

[31] As a variation on the fourth element of reputational harm, "[d]efamation is also actionable per se. . . . Slander is . . . actionable [per se] if it charges a crime. . . . To be actionable per se, the [defamation] must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached. . . . The modern view of this requirement is that the crime be a chargeable offense which is punishable by imprisonment.

. . . In the case of a statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it. . . . In such case, [t]he individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the [defamation] caused him." (Citations omitted; internal quotation marks omitted.) *Skakel* v. *Grace*, 5 F. Supp. 3d 199, 206–207 (D. Conn. 2014); see also, e.g., *Urban* v. *Hartford Gas Co.*, supra, 139 Conn. 308; *DeVito* v. *Schwartz*, 66 Conn. App. 228, 234–35, 784 A.2d 376 (2001).

[32] The Appellate Court cited *Dacey* v. *Connecticut Bar Assn.*, supra, 170 Conn. 534, for the proposition that, in contrast to public figures, "if the plaintiff is a private individual . . . she is required to prove actual malice, in order to rebut the defense of privilege and recover general damages, merely by a preponderance of the evidence." *Miles* v. *Perry*, supra, 11 Conn. App. 590. With respect to common-law privilege defenses, we note by way of background, that "[a] defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. . . . When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. . . . The first is whether the privilege applies, which is a question of law over which our review is plenary. . . . The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact. . . . In a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them. . . . Finally, to the extent that a litigant challenges the legal standard that is required to establish that a privilege has been defeated, that issue is a question of law over which our review is plenary." (Citations omitted.) *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 628–29; see also, e.g., *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 279–80; *Cweklinsky* v. *Mobil Chemical Co.*, supra, 267 Conn. 228–29; *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 535, 646 A.2d 92 (1994), cert. denied, 513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995).

Qualified privileges may be defeated by a showing, by a preponderance of the evidence; see *Miles* v. *Perry*, supra, 11 Conn. App. 590; of actual malice, also known as constitutional malice, or malice in fact. See, e.g., *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 634 (common-law intracorporate communications privilege); *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 114–15 (fair comment privilege); see also *Konikoff* v. *Prudential Ins. Co. of America*, 234 F.3d 92, 99 (2d Cir. 2000) ("[t]he critical difference between common-law malice and constitutional malice, then, is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth").

Thus, we note that the statement of the standard of proof articulated in *Miles* v. *Perry*, supra, 11 Conn. App. 590, appears accurate with respect to common-law defamation issues lacking first amendment significance, such as privilege defenses. We emphasize, however, that given the constitutional implications; see, e.g., *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 350; *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 148–49; the clear and convincing evidence standard furnishes the applicable standard of proving actual malice to sustain an award of punitive damages to a private figure plaintiff. See, e.g., *Lester* v. *Powers*, 596 A.2d 65, 70 (Me. 1991) ("[w]e do not require clear and convincing evidence, however, to overcome a conditional privilege that arises at common law and not from the [f]irst [a]mendment"); *Reiter* v. *Manna*, 436 Pa. Super. 192, 198–99, 647 A.2d 562 (1994) ("a private figure plaintiff cannot recover punitive damages unless he or she demonstrates actual malice by clear and convincing evidence"); *Deloach* v. *Beaufort Gazette*, 281 S.C. 474, 480, 316 S.E.2d 139 ("[F]or actual damages in a libel action neither . . . [*New York Times Co.*] nor *Gertz* . . . require the states to adopt a degree of proof more demanding than by 'a preponderance of the evidence' where a private individual is involved. For a private individual to recover punitive damages in a libel action, however, he must prove actual malice by clear and convincing evidence."), cert. denied, 469 U.S. 981, 105 S. Ct. 384, 83 L. Ed. 2d 319 (1984); cf. *Chapadeau* v. *Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975) (New York defamation law requires that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties").

[33] Notwithstanding the plaintiff's failure to brief this issue, the dissent asserts that the statements at issue did not pertain to a matter of public concern and, therefore, are not subject to protection under the first amendment, thus permitting the plaintiff's claims to be governed exclusively under the common law. We respectfully disagree with the dissent's analysis of this point, in particular its reliance on: (1) the Mississippi Supreme Court's decision in *Sartain* v. *White*, supra, 588 So. 2d 204; and (2) the fact that

the defamatory statements at issue in this case were not directed to the public at large. We address each in turn.

First, we note that the Mississippi Supreme Court's decision in *Sartain* is a jurisprudential odd duck, which arose from a neighborhood dispute wherein defamation allegations arose from one party's accusations in numerous public fora, such as tirades and letters to public officials, that her neighbors were murderers, robbers, and terrorists. Id., 213. In holding that this was not a matter of public concern, thus relieving the parties alleging defamation, Lloyd White and Bess White, from having to prove actual malice in order to recover punitive damages, the Mississippi court rendered a particularly narrow decision that appeared to account for the actions of the plaintiff in that case, Josephine Sartain—a prolific self-represented party with apparent mental health problems—noting that the "form of the debate involved various pleadings, letters to city officials, and oral tirades within a neighborhood. The context of the debate involves a dispute between a respectable family as the accused and an accuser with a rather notorious past. *Though accusations of this nature generally are a matter of public concern, in this context and emanating from this source, we find that they are not in this case.*" (Emphasis added.) Id.; see also id. ("Sartain used, misused and played litigation games until she lost the game; yet, it is difficult to say that [Lloyd White and Bess White] won. Surely, they did not win more than they were entitled to, and we may be certain that the courts were patient and careful in hearing . . . Sartain.").

Second, the dissent's emphasis on the relatively private expression of the statements as indicative of the fact that they do not relate to a matter of public concern—as compared to publication through a book, news article, broadcast or other broad medium—sounds appealing, but is constitutionally unavailing. It is well settled that the "private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern." *Rankin* v. *McPherson*, 483 U.S. 378, 386 n.11, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); see also, e.g., id., 386–87 (derogatory statement by law enforcement employee about unsuccessful attempt on President Ronald Reagan's life pertained to matter of public concern, despite fact that it was made during private conversation with another employee); *Dongguk University* v. *Yale University*, 734 F.3d 113, 128–29 (2d Cir. 2013) (holding that allegedly defamatory statements pertained to matter of public concern under *Snyder* when they related to major scandal in South Korea, despite fact that they were private internal communications); *Cioffi* v. *Averill Park Central School District Board of Education*, 444 F.3d 158, 165 (2d Cir. 2006) (private letter sent by athletic director to superintendent criticizing football coach's supervision of team was matter of public concern when its subject "was no mere private employment grievance, but assaultive conduct against a minor that, when publicly disclosed, triggered criminal charges as well as public outcry").

[34] Accordingly, we need not address the defendants' claim, based on, inter alia, *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 795–96, 734 A.2d 112 (1999), that all three allegedly defamatory statements were expressions of opinion on a matter of public concern protected by the common-law fair comment privilege because they were statements of their views based on likely known facts, rather than actionable conveyances of objective fact. We note, however, that the bounds of the common-law fair comment privilege largely accord with first amendment protections for opinion. See *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 18–21, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 117–19; *Lester* v. *Powers*, supra, 596 A.2d 71 n.9. This is particularly so, insofar as there is no "wholesale defamation exemption for anything that might be labeled 'opinion' " because "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich* v. *Lorain Journal Co.*, supra, 18. Put differently, under the first amendment after *Milkovich*, the "mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 152; see also *Mr. Chow of New York* v. *Ste. Jour Azur S.A.*, 759 F.2d 219, 226 (2d Cir. 1985) (multifactor test for determining whether statement is protected opinion); *Daley* v. *Aetna Life & Casualty Co.*, supra, 795–96 (citing *Mr. Chow of New York* for test).

[35] Consistent with this independent review, we note that other determinations related to the first amendment in the defamation context present questions of law for the court, such as whether a statement relates to a matter of public concern, whether a plaintiff is a public figure, or whether a statement is defamatory per se. See, e.g., *Celle* v. *Filipino Reporter Enterprises, Inc.*, supra, 209 F.3d 176–77; *Flamm* v. *American Assn. of University Women*, supra, 201 F.3d 148; *Skakel* v. *Grace*, supra, 5 F. Supp. 3d 207.

[36] In *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 628–29, we cited *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 525, and *Bleich* v. *Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985), in describing the standard of review, noting that whether an applicable common-law "privilege nevertheless has been defeated through its abuse, which is a question of fact," and that in "a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them." See also footnote 32 of this

opinion. Our citation to *Woodcock* was cautionary, noting in the parenthetical reference that it stood for the proposition that, "in [an] appeal of [a] defamation case brought by [a] public figure, [the] clear and convincing evidence standard of review applies, rather than [the] clearly erroneous standard of review." First, we note that our description of *Woodcock* in *Gambardella* contained an apparent misstatement of the law, insofar as it conflated the clear and convincing burden of proof with the clearly erroneous standard of review on appeal, which are two distinct concepts. See, e.g., *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 225–27, 890 A.2d 509 (2006) (attorney ethics violation must be proven by clear and convincing evidence, but court reviews finding of such violation using clearly erroneous standard). Second, the clearly erroneous standard of review was applicable in both *Gambardella* and *Bleich*, because both cases concerned challenges to trial court determinations with respect to common-law privilege defenses in cases wherein no public concern was asserted, rather than constitutionally mandated matters such as the proof of actual malice to sustain a punitive damages award. See *Gambardella* v. *Apple Health Care, Inc.*, supra, 639–41 (intracorporate communications privilege for employment decisions); *Bleich* v. *Ortiz*, supra, 503–504 (conditional privilege of protecting ownership interest in personal property).

[37] In *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 351, the Supreme Court observed that, an individual's status as a "public figure" for defamation purposes "may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." The court held in *Gertz* that an attorney was not a public figure, despite his active role in community and professional affairs, because he "had achieved no general fame or notoriety in the community," and his role in the facts leading to the case were limited to representing a private client. Id., 351–52.

[38] Indeed, the Appellate Court's opinion neither addresses, nor indicates that the defendants raised therein, a claim that the plaintiff was constitutionally required to prove that all of the allegedly defamatory statements were made with actual malice. This issue is not squarely presented in the defendants' petition for certification, either. We emphasize that, in a certified appeal, we "ordinarily decline to consider claims that are not raised properly before the Appellate Court or in the petition for certification to appeal to this court. . . . In a certified appeal, the focus of our review is not [on] the actions of the trial court . . . but [on] the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 26 n.1, 917 A.2d 978 (2007). We note, however, that in their petition for certification, the defendants claimed that the plaintiff had failed to carry her burden of proving the falsity of the allegedly defamatory statements. Given the legal congruence between these constitutional arguments, and the fact that the plaintiff does not raise a procedural objection to them, we exercise our discretion to consider these issues on their merits.

[39] The dissent criticizes us for reaching this issue, given what it deems the apparent "failure of any party to request that we do so." Although we ordinarily will decide issues not raised by the parties only in exceptional circumstances, our discussion of this point is necessary to avoid enshrining in the Connecticut Reports an error of first amendment law that would be created by unquestioning adherence to the defendants' overly generous view of *Obsidian Finance Group, LLC* v. *Cox*, supra, 740 F.3d 1284, particularly given the general unresponsiveness of the plaintiff's brief.

[40] The defendants' argument is not without some support, notwithstanding their failure to cite it. In *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 43–44, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), which preceded *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 323, a plurality of the United States Supreme Court extended the actual malice standard adopted in *New York Times Co.* to defamation actions brought by private individuals in cases concerning matters of public concern, at least insofar as media defendants were concerned. Three years later in *Gertz*, a majority of the United States Supreme Court rejected the approach of the *Rosenbloom* plurality. See *Gertz* v. *Robert Welch, Inc.*, supra, 345–46. We note that a few states have, as a matter of state constitutional or common law, adopted the *Rosenbloom* standard

apparently espoused by the defendants in this case, to provide greater protection to the freedom of speech. See, e.g., *Diversified Management, Inc.* v. *Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982); *Journal-Gazette Co.* v. *Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind.), cert. denied, 528 U.S. 1005, 120 S. Ct. 499, 145 L. Ed. 2d 385 (1999); *Senna* v. *Florimont*, 196 N.J. 469, 488–90, 958 A.2d 427 (2008); *Alpine Industrial Computers, Inc.* v. *Cowles Publishing Co.*, 114 Wn. App. 371, 393, 57 P.3d 1178 (2002). This represents, however, a distinct minority position. See, e.g., *Kennedy* v. *Sheriff of East Baton Rouge*, 935 So. 2d 669, 680–81 (La. 2006); *Senna* v. *Florimont*, supra, 485 n.11. As noted previously; see footnote 5 of this opinion; insofar as the defendants have not provided us with an independently briefed claim, with analysis consistent with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), in support of a claim of greater protection under the Connecticut constitution, we confine our analysis to the first amendment.

[41] "[I]t is well settled that decisions of the Second Circuit, while not binding upon this court, nevertheless carry particularly persuasive weight in the resolution of issues of federal law when the United States Supreme Court has not spoken on the point. . . . This is particularly so given the existence of a circuit split, because [d]eparture from Second Circuit precedent on issues of federal law . . . should be constrained in order to prevent the plaintiff's decision to file an action in federal District Court rather than a state court located a few blocks away from having the bizarre consequence of being outcome determinative." (Citations omitted; internal quotation marks omitted.) *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 783–84, 23 A.3d 1192 (2011).

[42] The United States Court of Appeals for the Ninth Circuit has observed that "every . . . circuit to consider the issue has held that the [f]irst [a]mendment defamation rules in [*New York Times Co.* v. *Sullivan*, supra, 376 U.S. 254] and its progeny apply equally to the institutional press and individual speakers." *Obsidian Finance Group, LLC* v. *Cox*, supra, 740 F.3d 1291.

[43] Indeed, the plaintiff's reliance on *Goodrich* is belied by footnote 6 of that opinion, wherein we acknowledged that, in light of constitutional decisions in the wake of *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 254, "as a practical matter the burden of proving the falsity of the publication has been shifted to the plaintiff . . . ." *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 112 n.6.

[44] The United States Supreme Court has observed that "[t]here is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence." *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 661 n.2, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989); see also, e.g., *World Wide Assn. of Specialty Programs* v. *Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006) (discussing split in authorities); *Turner* v. *KTRK Television, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (same). Although the Supreme Court's review of the divided authorities in *Harte-Hanks Communications, Inc.*, indicated that the Second Circuit follows the preponderance standard on this point, citing *Goldwater* v. *Ginzburg*, 414 F.2d 324, 341 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970), the Second Circuit has subsequently concluded that *Goldwater* does not reflect the current state of constitutional defamation law, and that this issue remains an open question as a matter of federal law, including within the Second Circuit. See *DiBella* v. *Hopkins*, 403 F.3d 102, 110 (2d Cir.), cert. denied, 546 U.S. 939, 126 S. Ct. 428, 163 L. Ed. 2d 326 (2005); see also id., 114–15 (applying clear and convincing standard as matter of New York state law, and noting that majority of state and federal courts apply that standard to falsity element); *Blair* v. *Inside Edition Productions*, 7 F. Supp. 3d 348, 357 (S.D.N.Y. 2014) ("[n]or has the Second Circuit articulated the appropriate standard of proof"); but see *Rattray* v. *National City*, 51 F.3d 793, 801 (9th Cir. 1994) (adopting Second Circuit's decision in *Goldwater* in holding that plaintiff need only demonstrate falsity by preponderance of evidence), cert. denied, 516 U.S. 820, 116 S. Ct. 80, 133 L. Ed. 2d 39 (1995).

We note that the dissent criticizes us for failing to reach this open question of first amendment law and determine the applicable burden of persuasion on remand with respect to the element of falsity. Given the lack of briefing on this point, the fact, as noted by the dissent, that the burden may not necessarily be determinative on remand depending on the trial court's assessment of the level of proof, and our general reluctance to decide constitutional issues unnecessarily; see, e.g., *State* v. *Torres*, 230 Conn. 372, 382, 645 A.2d 529 (1994); we deem the dissent's criticism to be unwarranted.

[45] At least one court has acknowledged some intuitive appeal in the plaintiff's argument, which is consistent with much of the discussion in *Philadel-*

*phia Newspapers*, *Inc.* v. *Hepps*, supra, 475 U.S. 778–79, with respect to implying a finding of falsity from an express finding of actual malice. See *Bentley* v. *Bunton*, 94 S.W.3d 561, 587 (Tex. 2002).

[46] The plaintiff had told Vrabel that Bill had been "harassing her," shortly before they received a call from his neighbor indicating that he was missing.

[47] The affidavit, which was authored by a Woodbridge police officer, James Sullivan, supports an arrest warrant for Janice Smolinski on charges of trespass in the first degree and disorderly conduct, arising from the placement of posters at an elementary school in Woodbridge.

[48] We note that the defendants argue in their brief that the plaintiff "admits she continues to withhold information from the police about [Bill's] disappearance." The defendants support this assertion with a "see" citation to the plaintiff's testimony recorded on page 118 of the November 29, 2011 trial transcript. Having reviewed page 118 and surrounding pages in that transcript, we do not see any support at all for such an admission, which would in essence be the proverbial smoking gun. We caution the defendants that the use of the "see" signal in citations is not absolution from assuring their factual accuracy. Cf. Rules of Professional Conduct 3.3 (a) (1).

[49] We do note, however, that the plaintiff testified that Janice Smolinski had stated to her that she would not leave the plaintiff alone even if the plaintiff passed the polygraph "with flying colors . . . ."

[50] See *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 640 (nursing home supervisor admitted that he was specifically aware that employee had been given resident's property as gift, meaning that "there simply was no basis for a belief that the plaintiff had stolen property from the facility," and plaintiff's violation of gifting policy "did not alter the ownership of the property and cannot alter the meaning of theft, a criminal act defined by law"); *Holbrook* v. *Casazza*, supra, 204 Conn. 348–50 (defendants admitted that they did not check veracity of their original accusations, including their factual and legal validity, and continued to publish them after being apprised that investigation had determined that they were invalid); *Nelson* v. *Tradewind Aviation, LLC*, supra, 155 Conn. App. 537–41 (sufficient evidence of actual malice to support defendant's forfeiture of qualified privilege in providing employment references when there was ample evidence of knowing falsity of statements with regard to pilot's alleged termination for reasons related to performance, rather than lack of work); see also *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 691–92, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (sufficient evidence of actual malice held when publisher failed to consult key witness and to listen to readily available tape recording of relevant conversation to verify informant's "highly improbable" allegations, which had already been made doubtful by statements of other witnesses); cf. *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 542–44 (There was no clear and convincing evidence of actual malice when, despite evidence that the newspaper had tried to harm the legislative campaign of the plaintiff's husband, the reporter relied on past articles for facts, and the plaintiff did not call the newspaper editor to testify about "whether he or she had been aware of the inaccuracy at the time the article was published. In the absence of evidence to the contrary, the most that can be said is that the defendants were negligent in researching and publishing the article.").

[51] The plaintiff cites her testimony indicating that she was unaware of Bill's disappearance until three days after it had happened as "sufficient to establish that [she] had no knowledge whatsoever concerning the disappearance of [Bill]." The plaintiff further argues that "[t]here was no evidence at all to the contrary." Insofar as the trial court's memorandum of decision fails to acknowledge the governing constitutional standards regarding falsity or indicate specifically that it credited the plaintiff's testimony on this point, we decline to engage in appellate fact-finding by using this portion of the transcript to uphold the judgment.

[52] Because of our conclusion with respect to the defendants' other claims on appeal, we need not reach their additional argument that, under *DeVito* v. *Schwartz*, 66 Conn. App. 228, 784 A.2d 376 (2001), the plaintiff was entitled only to nominal damages because she failed to adduce evidence of reputational or other harm to support her claim to compensatory damages.